UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| JOHN A. HAWKINS-EL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:23-cv-00549-JRO-MKK |
| | ) | |
| K. FISCHER, | ) | |
| PORTER-MARTS Mrs., Case Worker | ) | |
| Manager, | ) | |
| MATT LEHOR, | ) | |
| K. HUNTER Acting Deputy Warden, | ) | |
| FRANK VANIHEL Warden, | ) | |
| R. PURCELL Unit Team Manager, | ) | |
| K. GILMORE, | ) | |
| M. ELLIS, | ) | |
| MEEKS Mrs., | ) | |
| A. MOSELEY, | ) | |
| YARBER Lieutenant, | ) | |
| HOLCOMB Lieutenant, | ) | |
| M. PAYNE, | ) | |
| D. BEDWELL, | ) | |
| B. BUTLER, | ) | |
| NEFF Officer, | ) | |
| VOIGTSCHILD Major, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

Plaintiff John A. Hawkins-el alleges that the defendants violated his

constitutional rights during the time he spent in segregation at Wabash Valley

Correctional Facility ("Wabash Valley"). Specifically, he claims he was not

afforded adequate due process regarding his segregation placement as required

by the Fourteenth Amendment, that his conditions of confinement and food in

segregation violated the Eighth Amendment, and that he was subjected to a body

cavity strip search as an improper condition for him to retrieve his legal mail in

violation of the First Amendment.[1]   Defendants have moved for summary judgment. Dkts. [74], [78].  For the reasons below, those motions are **GRANTED**.

Before turning to the summary judgment motions themselves, the Court **GRANTS** the Defendants' motion to substitute exhibits.  Dkt. [82].  The exhibits attached at dockets 82-1, 82-2, 82-3, and 82-4 will replace the exhibit at docket 79-16.  The Court will cite to the exhibits in docket 82 as appropriate.[2]

The Court **DENIES** Hawkins-el's motion to stay ruling on the summary judgment motions.  Dkt. [84].  The motion was predicated on resolution of a pending discovery dispute, which was resolved by the Magistrate Judge shortly after Hawkins-el filed his motion.  Dkt. 85.

## I. SUMMARY JUDGMENT STANDARD

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a).  When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party.  *Khungar v. Access Cmty. Health Network*, 985 F.3d 565,

---

[1] Hawkins-el seems to also argue that he was deprived of access to the courts in violation of the First Amendment for other reasons, but the First Amendment claim addressed in this order is the only First Amendment claim that the Court allowed to proceed at screening. Dkt. 30 at 5-6.  The Court specifically stated that any other First Amendment access to courts claims were dismissed.  *Id.* at 7.

[2] In the future, a motion to substitute an exhibit submitted in support of a motion should be accompanied by an amended brief that cites to the substituted exhibit instead of the replaced exhibit.  Defendants' repeated citations to docket 79-16 in their opening summary judgment brief, and not the exhibits in docket 82, made the Court's review of this matter considerably more difficult.

572–73 (7th Cir. 2021).    It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder.  *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014).  A court only has to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it need not "scour the record" for evidence that might be relevant.  *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 573–74 (7th Cir. 2017) (cleaned up).

A party seeking summary judgment must inform the district court of the basis for its motion and identify the record evidence it contends demonstrates the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits.    Fed. R. Civ. P. 56(c)(1)(A).  Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment.  Fed. R. Civ. P. 56(e).

## II.  FACTUAL BACKGROUND

Because Defendants have moved for summary judgment under Rule 56(a), the Court views and recites the evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor.  *Khungar*, 985 F.3d at 572–73.

3

### A. Parties

Plaintiff Hawkins-el entered the custody of the Indiana Department of Correction ("IDOC") in 1999.  Dkt. 79-1 at 10.  The incidents alleged in this lawsuit occurred when he was incarcerated at IDOC Wabash Valley in the Secured Confinement Unit ("SCU"). *Id.* at 14. Currently, Hawkins-el is at IDOC New Castle Correctional Facility ("New Castle" or "NCN TU").  *Id.* at 10.

Defendant Jacquelynne Porter-Marts was Hawkins-el's caseworker in the Wabash Valley SCU for some of the relevant time.  Dkt. 79-2 ¶ 4. One of Porter-Marts's duties was to conduct 7- and 30-day classification reviews of persons incarcerated in the SCU. *Id.* ¶ 9.

Defendant Mathew Leohr was and is Supervisor of Classification at Wabash Valley.  Dkt. 79-3 ¶¶ 2, 4.  His job responsibilities include assigning security levels, custody levels, bed assignments, job assignments, program assignments, releases, liaising with the state parole board, and keeping official records.  *Id.* ¶ 5.

Defendant Kevin Hunter was and is a Unit Team Manager ("UTM") at Wabash Valley, but did not work in the SCU.  Dkt. 79-4 ¶¶ 3-4.  Hunter occasionally served as Wabash Valley Acting Deputy Warden of Re-Entry.  *Id.* ¶ 5. In this role, Fisher reviewed and responded to inmate intra-facility classification appeals.  *Id.* ¶ 6.

Defendant Ashley Mosely was Hawkins-el's caseworker in the Wabash Valley SCU for some of the relevant time period, beginning in January 2024.

4

Dkt. 79-5 ¶¶ 4, 5.  One of Mosely's duties was to conduct 30-day reviews of SCU inmates.  *Id.* ¶ 6.

Defendant Jerricha Meeks was a UTM in the Wabash Valley SCU during the relevant time.  Dkt. 79-6 ¶ 4.  One of Meeks's duties was to ensure that 7- and 30-day classification reviews were correctly completed by caseworkers and to participate in 90-day reviews.  *Id.* ¶¶ 5, 7.

Defendant Katherine Fischer was a UTM in the Wabash Valley SCU from January 2023 to January 2024, after which she was promoted to Wabash Valley Deputy Warden.  Dkt. 79-7 ¶ 4.  One of Fischer's duties as UTM was to ensure that 7- and 30-day classification reviews were correctly completed by caseworkers.  *Id.* ¶ 8.  As Deputy Warden, she had no responsibility for 7- or 30-day reviews for SCU inmates, but she did participate in full-status reviews.  *Id.* ¶ 11.

Defendant Frank Vanihel was Wabash Valley Warden during the relevant time period.  Dkt. 79-8 ¶ 4.  As Warden, Vanihel participated in 90-day classification reviews, and reviewed any other classification reviews that recommended inmate movement.  *Id.* ¶¶ 6, 8.

Defendant Kevin Gilmore was Wabash Valley Deputy Warden of Re-Entry during the relevant time period.  Dkt. 79-9 ¶ 3.  One of his duties was responding to inmate intra-facility classification appeals.  *Id.* ¶ 4.

Defendant Michael Ellis is a Correctional Program Coordinator at Wabash Valley.  Dkt. 79-10 ¶ 3.  One of his duties was responding to disciplinary hearing board appeals.  *Id.* ¶ 6.

Defendant Christopher Holcomb is a Correctional Lieutenant who was assigned to the Wabash Valley SCU during the relevant time.  Dkt. 79-11 ¶ 4.

Defendant Richard Yarber is a Correctional Lieutenant who was assigned to the Wabash Valley SCU during the relevant time.  Dkt. 79-12 ¶ 4.

Defendant Mark Payne was and is the Wabash Valley Physical Plant Director. Dkt. 79-13 ¶ 3-4.

Defendant Michael Voigtschild was and is a Correctional Major at Wabash Valley.  Dkt. 79-14 ¶ 3-4.

Defendant Caleb Neff is a Correctional Officer who was assigned to the Wabash Valley SCU during the relevant time.  Dkt. 79-15 ¶¶ 3-4.

Defendant Randall Purcell was a UTM at Wabash Valley during at least part of the relevant time.  Dkt. 31 at 2.

All of the above defendants can collectively be referred to as "IDOC Defendnats."

Defendant Daniel Bedwell, an employee of Aramark Correctional Services, LLC ("Aramark"), was Food Service Director at Wabash Valley during the relevant time period.  Dkt. 76-1 ¶ 3.  One of Bedwell's duties was to oversee the preparation of daily meals for inmates and to confirm that they complied with the requirements of Aramark's contract with the IDOC.  *Id.* ¶¶ 5, 6.

Defendant B. Butler was an Aramark employee at Wabash Valley during the relevant time.  Dkt. 31 at 4.  Butler responded to Hawkins-el's grievances about the food he was receiving in the SCU.  Dkt. 76-1 at 96-97.

6

**B. Hawkins-el's Wabash Valley SCU Placement and Classification Reviews**

On April 27, 2022, officials at Miami Correctional Facility, where Hawkins-el was then incarcerated, filed a "Report of Conduct" alleging that Hawkins-el had assaulted two guards on April 22, 2022, resulting in injuries serious enough to require hospital treatment for the guards. Dkt. 82-1 at 85. This report resulted in Hawkins-el being assigned to Department-Wide Restrictive Housing–Disciplinary ("DWRH-D") on September 22, 2022, at which time he was transferred to the Wabash Valley SCU. *Id.* at 87. The assault also resulted in criminal charges being filed against Hawkins-el. Dkt. 79-1 at 20. Originally, Hawkins-el was sanctioned to two years in DWRH-D status, but it was reduced to 18 months on appeal. *Id.* at 20–21.

After the reduction of Hawkins-el's sanction, he was scheduled to be removed from DWRH-D status on October 20, 2023. *Id.* at 27. Before that date, Caseworker Porter-Marts communicated with Wabash Valley's Office of Investigations and Intelligence ("OII") and UTM Fischer about whether Hawkins-el should be released from segregation after his time in DWRH-D ended or if he should be recommended for assignment to Department-Wide Restrictive Housing – Administrative ("DWRH-A").[3] Dkt. 79-2 ¶ 7. It was recommended that Hawkins-el be transferred to DWRH-A status. *Id.* On October 16, Caseworker

---

[3] The Court is aware that the IDOC often refers to the segregation statuses differently, such as by using "DWARH" or "DW-ARSH" for Department-Wide Administrative Restrictive Housing. *See, e.g.,* Dkt. 79-2 ¶ 7; dkt. 82-1 at 14. Some of the records before the Court use the "DWRH-D" and "DWRH-A" acronyms. The Court finds those acronyms easiest to follow and will use them in this Order.

Porter-Marts submitted paperwork to begin the process of transferring Hawkins-el to DWRH-A status. *Id.* ¶ 8. Specifically, on October 16 she signed a "Report of Classification Hearing" recommending Hawkins-el be transferred to any IDOC DWRH-A facility because of "two serious staff assaults resulting in SBI." Dkt. 82-1 at 66. The Wabash Valley SCU would be one such facility. *Id.* As described by Hawkins-el, the DWRH-A part of the SCU is identical to the DWRH-D part, except they are located on opposite sides of the building. Dkt. 79-1 at 35. For the time being, Hawkins-el remained in the DWRH-D part of the SCU.

Also on October 16, Caseworker Porter-Marts signed a Behavior Modification Plan ("BMP"), recommending Hawkins-el's placement in DWRH-A because of "history of assaultive behavior," "facility's need to contain, prevent, or end a disturbance/threat to the orderly operation of the facility," "documented history of behavior that impacts safety and security in the general population," and noting that Hawkins-el had committed "two serious staff assaults resulting in SBI." *Id.* at 67. The BMP did acknowledge that Hawkins-el had no "A or B conduct violations" since the April 2022 incident. *Id.* The BMP also referred Hawkins-el for anger management consultation. *Id.*

Hawkins-el was informed sometime in early October that he would be remaining in the SCU after his DWRH-D time was up and while the DWRH-A request was under consideration. Dkt. 79-7 ¶¶ 6, 7. On October 12, Hawkins-el submitted a classification appeal regarding his continued placement in segregation. Dkt. 82-1 at 1. On November 14, the appeal was returned by Acting Deputy Warden Hunter because Hawkins-el submitted it "prior to a decision

8

being made regarding the facility recommendation." *Id.* at 2. Hawkins-el submitted a second classification appeal on October 23, which on October 24 again was returned to him, this time by Classification Supervisor Leohr, for the same reasons as before. *Id.* at 3, 71.

On October 26, Hawkins-el filed a disciplinary hearing appeal based on the recommendation that he be placed on DWRH-A after his disciplinary segregation time ended. *Id.* at 4. Ellis denied because "this is a classification issue." *Id.*

On November 6, Hawkins-el submitted a classification appeal to IDOC Central Office. *Id.* at 74. On December 11, non-defendant Derek Christian in the IDOC Central Office Classification Division denied this appeal because the appeal was "submitted prior to a decision being made regarding the facility recommendation." *Id.* at 73. Christian also wrote a letter to Hawkins-el informing him that "[t]ransfer requests are processed at the facility prior to being submitted to the Central Office Classification Division. Any concerns you have regarding the status of the transfer request may be addressed by contacting your assigned facility unit team staff." *Id.* at 72.

Hawkins-el asserts, and Defendants do not deny, that IDOC policy regarding administrative segregation placement requires 7-day reviews during the first two months of such placement and 30-day reviews thereafter. There is no direct evidence in the record of Hawkins-el receiving any 7-day reviews during his time in the SCU on DWRH-A status. Also, aside from the initial discussion of whether Hawkins-el should remain in segregation after completion of his

DWRH-D time, there is no direct evidence of any reviews at all of Hawkins-el's placement occurring until January 2024.[4]

On January 19, 2024, Warden Vanihel wrote a letter to IDOC Executive Director Julie Lanham, recommending that Hawkins-el be assigned to DWRH-A. *Id.* at 87. Warden Vanihel noted that Hawkins-el had a total of 14 major conduct violations while incarcerated, including the April 2022 assault on two officers. *Id.* Warden Vanihel noted Hawkins-el had no confirmed Security Threat Group associations. *Id.* Warden Vanihel also stated that "Unit Team Management and the Office of Investigation and Intelligence" recommended Hawkins-el's placement in DWRH-A. *Id.* Also, sometime in January Hawkins-el was transferred to a cell in the DWRH-A part of the SCU. Dkt. 79-1 at 35.

Beginning in January 2024, the record reflects that Caseworker Moseley completed and signed facility-wide 30-day reviews of Hawkins-el's DWRH-A status. In these reviews, she recommended continued placement in DWRH-A in each report through July, review for transfer beginning in late August through late October, and then release in her final 30-day review, as follows:

- January 31, 2024: Caseworker Moseley recommended Hawkins-el's continued placement in DWRH-A. Dkt. 82-1 at 13. The comments in the review stated in part, "[Hawkins-el] has no pending conduct at this

---

[4] Some of the IDOC Defendants have attested generally that it was their responsibility to conduct 7-day and 30-day reviews of inmates in the SCU, or to ensure that subordinate employees were conducting the reviews. None of them, however, directly attested to conducting 7-day reviews for Hawkins-el, nor is there any documentation that these reviews took place. There also is no documentation of any 30-day reviews taking place until the end of January 2024.

time. It appears that [Hawkins-el] did not have a Behavior Modification Plan currently so he was given one. He was recommended for the ACT program, Thinking for a Change (if avail.), and Anger Management. . . . It is recommended that [Hawkins-el] completes all Carey Guides and Worksheets that case management sends to him. . . ." *Id.* A Behavior Modification Plan ("BMP") issued on the same date stated that the reasons for Hawkins-el's continued placement in "DW-ARSH" included "History of assaultive behavior," "Facility's need to contain, prevent, or end a disturbance/threat to the orderly operation of the facility," and "Documented history of behavior that impacts safety and security in the general population." *Id.* at 14. The BMP recommended Hawkins-el's participation in the ACT and Thinking for a Change programs and independent study for anger management, and also that he participate in mental health evaluations. *Id.* The BMP also noted that Hawkins-el had no "A or B" conduct violations since the April 22, 2022, incident. *Id.*

- February 26, 2024: Caseworker Moseley recommended Hawkins-el's continued placement in DWRH-A. *Id.* at 15. The comments in the review stated in part, "[Hawkins-el] had requested a referral for Anger Management at the end of 2023, but he told them that he no longer wanted to participate. [Hawkins-el] successfully completed the Carey Guide: Rewards and Sanctions Tool #1 . . and did a good job filling out the worksheet. He will be explained the BMP again at cell front due to

11

saying that his BMP contained 'negative comments.' [Hawkins-el] is reminded to be patient . . . ."  *Id.*  The BMP issued in conjunction with this review repeated the contents of the previous month's BMP.  *Id.* at 16.

- March 26, 2024: Caseworker Moseley recommended Hawkins-el's continued placement in DWRH-A.  *Id.* at 20.  The comments in the review stated in part that Mr. Hawkins-el was not participating in any of the previously-recommended programs.  *Id.*  "He was given the Carey-Guide: Rewards and Sanctions Tool #2 . . . to be completed prior to his next review to show positive adjustment while he is DWRH-A."  *Id.*  The BMP issued in conjunction with this review repeated the contents of the previous months' BMPs.  *Id.* at 21.

- April 26, 2024: Caseworker Moseley recommended Hawkins-el's continued placement in DWRH-A.  *Id.* at 22.  It again noted that he was not participating in the recommended programs.  *Id.*  Also, Hawkins-el completed the worksheet given to him at his last review but "he failed to follow directions . . . ."  *Id.*

- May 28, 2024: Caseworker Moseley recommended Hawkins-el's continued placement in DWRH-A.  *Id.* at 23.  It again noted he was not participating in the recommended programs.  *Id.*  Also, Hawkins-el had successfully completed another Carey Guide worksheet and was advised to request the next worksheet.  *Id.*  The BMP issued on that date contained the same information as before.  *Id.* at 24.

12

- June 25, 2024: Caseworker Moseley recommended Hawkins-el's continued placement in DWRH-A, again noting his failure to participate in programming. *Id.* at 26. A BMP signed by Caseworker Mosely the same day contained the same information as before. *Id.* at 25.

- July 31, 2024: Caseworker Moseley recommended Hawkins-el's continued placement in DWRH-A. *Id.* at 27. Again, it was noted that Hawkins-el was not participating in the recommended programs. *Id.* The BMP issued on that date contained the same information as before. *Id.* at 28.

- August 26, 2024, Caseworker Moseley recommended that Hawkins-el "[b]e reviewed for transfer" because of "[r]ecent positive adjustment" and "[o]ther." *Id.* at 29. Although the review comments noted that Hawkins-el still was not participating in programming, he had requested a referral for anger management and was placed on a wait list for it. *Id.*

- September 30, 2024: Caseworker Moseley recommended that Hawkins-el "[b]e reviewed for transfer." *Id.* at 30. The comments were similar to earlier reviews as to the reasoning regarding "positive adjustment" but that Hawkins-el still was not participating in programming. *Id.* The BMP issued on that date contained the same information as before. *Id.* at 31.

- October 25, 2024: Casework Moseley noted that Hawkins-el was recommended for release from DWRH-A but that he would remain in that status pending transfer. Dkt. 82-2 at 25. The comments stated

13

in part that Hawkins-el was not participating in any programming but it was recommended that he "maintain positive interactions with all staff and incarcerated individuals while awaiting his transfer . . . ." *Id.* The record also reflects that the following 90-day full reviews of Hawkins-el's DWRH-A status took place as follows:

- On January 3, 2024, UTM Purcell initiated a full review by filing a "Request for Release from Department-Wide Administrative Restrictive Status Housing." Dkt. 82-1 at 81. UTM Purcell recommended Hawkins-el be removed from segregation. *Id.* On February 1, Lt. Yarber agreed with UTM Purcell's recommendation. *Id.* As part of the review process Hawkins-el submitted written responses to a questionnaire about his DWRH-A placement. *Id.* at 83-85. On March 1, OII/STG Coordinator W. Garrison recommended that Hawkins-el remain in segregation. *Id.* at 82. On March 14, Hawkins-el met with a review board that consisted of Warden Vanihel, Deputy Warden Fischer, and UTM Meeks. Dkt. 79-7 ¶¶ 11, 12; Dkt. 82-1 at 82. Hawkins-el alleges that he was not allowed to present relevant evidence at this hearing. Afterwards, Warden Vanihel, Deputy Warden Fischer, and UTM Meeks also recommended that Hawkins-el remain in segregation, due to the severity of his assault on staff in April 2022 and their belief that he needed additional programming. Dkt. 82-1 at 82. On March 22, Caseworker Mosely informed Hawkins-el of the results of the full review and that he would be remaining in DWRH-A. *Id.* at 56.

14

- On April 11, 2024, UTM Purcell initiated a second full review by again filing a recommendation that Hawkins-el be removed from DWRH-A. Dkt. 82-3 at 51.  Hawkins-el again submitted written questionnaire responses for this review.  *Id.* at 2-3.  Lt. Leffler and an OII Coordinator recommended against Hawkins-el being removed from DWRH-A.  Dkt. 82-4 at 1-2.  On June 13, Hawkins-el again met with Warden Vanihel, Deputy Warden Fischer, and UTM Meeks.  *Id.* at 2.  Afterwards, all three again recommended against Hawkins-el being removed from DWRH-A. *Id.*  It again was noted that Hawkins-el was failing to participate in recommended programming.  *Id.*  Also, Deputy Warden Fischer believed Hawkins-el "does not have remorse or take responsibility." *Id.*  Warden Vanihel also noted that Hawkins-el "remains argumentative when discussing incident that occurred in past and present actions."  *Id.*  On June 18, Caseworker Moseley informed Hawkins-el of the results of the full review and that he would be remaining in DWRH-A.  Dkt. 82-3 at 30.

- On July 17, 2024, UTM Purcell initiated a third full review of Hawkins-el's DWRH-A status with another recommendation that he be removed from that status.  Dkt. 82-3 at 39.  Hawkins-el again completed questionnaire responses.  *Id.* at 43-44.  Lt. Leffler again recommended against removing Hawkins-el from DWRH-A status, as did the OII Coordinator.  *Id.* at 39-40.  However, after meeting with Hawkins-el on August 13, Warden Vanihel, Deputy Warden Fischer, and UTM Meeks

15

agreed that he should be removed from DWRH-A status, with a recommendation that he be moved to the New Castle Correctional Facility Transition Unit ("NCN TU").  *Id.* at 40.

On September 13, 2024, Warden Vanihel submitted a letter to IDOC Executive Director Lanahm recommending that Hawkins-el be removed from DWRH-A status.  *Id.* at 22.  On September 23, Warden Vanihel submitted a request to IDOC Central Office that Hawkins-el be transferred to the NCN TU. *Id.* at 11.  IDOC Central Office approved the transfer request on or about November 7, 2024.  Dkt. 82-2 at 23.  On or about November 13, 2024, Hawkins-el was transferred to the NCN TU.  Dkt. 79-6 ¶ 16.

In addition to the above reviews, on February 13, March 26, and April 8, 2024, Hawkins-el filed classification appeals regarding his DWRH-A placement. Dkt. 82-1 at 32–34.  On May 2, 2024, non-defendant Jack Hendrix at IDOC Central Office denied all three appeals, stating in part: "[t]he decision to continue your assignment in [DWRH-A] is correct and you are appropriately placed based upon the severity of your recent conduct that has resulted in outside pending charges."  *Id.* at 35.  Hawkins-el filed an additional classification appeal on May 13, 2024, which also was denied by Hendrix.  *Id.* at 36.

Also, in April 2024 Caseworker Moseley completed an annual review of Hawkins-el's classification level.  Dkt. 79-5 ¶ 10; Dkt. 82-3 at 5.  An annual classification review results in an automatically-generated security level code after taking into account an inmate's age, medical code, disability code, past highest conduct, conduct within the past year, any violent conduct within the

16

past 5 years, and any parole violations with the past 5 years.  Dkt. 79-5 ¶ 11. Hawkins-el's review resulted in a classification of Security Level 3, but Caseworker Moseley recommended overridding this classification for "additional observation" and that Hawkins-el remain designated Security Level 4.  Dkt. 82-3 at 5.

### C. SCU Conditions of Confinement[5]

Staff in the SCU regularly checked and logged temperatures in the SCU. Dkt. 79-11 ¶ 5.  Wabash Valley maintenance staff were contacted if temperatures in the SCU seemed to be too cool.  Dkt. 79-12 ¶ 16.  SCU inmates were standard-issued boxers, t-shirts, sweats, uniforms, a coat, a toboggan, and two blankets. Dkt. 79-12 ¶¶ 17–18.  Inmates could request additional clothing and blankets during the winter.  *Id.* ¶ 19.

In the SCU, standard lighting was on in the ranges during the day shift (6 a.m. to 6 p.m.), which was turned off during the night shift (6 p.m. to 6 a.m.) and dim lights turned on instead for security purposes.  *Id.* ¶ 5.  Each SCU cell had lights that were controlled by a touch bolt by either the inmate or the control pod.  Dkt. 79-13 ¶ 6.  When turning off the main light, a low wattage night light

---

[5] Regarding this issue, and the strip search issue, Hawkins-el did not specifically identify any material facts in dispute with citation to admissible evidence as required by Local Rule 56-1(b).  He devoted only one paragraph of his summary judgment response to the conditions of confinement issue, in which he argues that his requests for healthcare that he filed while in the SCU demonstrated that conditions there were unhealthy and that Defendants Lt. Yarber, Lt. Holcomb, and Payne "failed to uphold their responsibilities by the IDOC Guidelines & Policies." Dkt. 94 at 13.  He also devoted only one paragraph of his response related to the issue of his receipt of legal mail, but which seems more focused on whether he was denied access to the courts, and no such claim is pending in this case.  In light of Hawkins-el's failure to specifically identify disputed facts on these issues, the facts as alleged by Defendants are "admitted without controversy" so long as support for them exists in the record.  S.D. Ind. L.R. 56-1(e)-(f).

17

would remain on in the cell for safety and security purposes. *Id.* ¶ 7. If a touch bolt malfunctioned, it would be replaced on the same day if Wabash Valley had the needed parts in stock. *Id.* ¶ 8. If the touch bolt in an individual cell stopped working, the inmate could request the control pod to turn the main cell light on or off. *Id.* ¶ 9.

Sometimes, there were problems with the hot water supply in the SCU, which did not affect the cold water supply to the SCU cells. Dkt. 79-11 ¶ 9. If the hot water went out in the SCU, staff submitted work order requests to maintenance and took the inmates to a different range to shower. *Id.* ¶¶ 10, 11.

Inmates in the SCU were offered daily recreation opportunities. *Id.* ¶ 12. The outdoor recreation pads were cleaned at least twice a week by inmate workers or more often if needed, using power washers, brushes, and chemicals. *Id.* ¶ 13; Dkt. 79-12 ¶ 8. Staff attempted to keep birds away from the outdoor recreation area, including by placing decoy owls in the area. Dkt. 79-12 ¶ 9. The indoor recreation pads were cleaned daily by inmate workers using chemicals, brushes, and a hose. *Id.* ¶ 10.

SCU inmates were responsible for the cleanliness of their cells. *Id.* ¶ 11. For this purpose, they were offered cleaning supplies twice a week, including toilet brushes, other brushes, a mop, germicide, and window cleaner. *Id.* If an inmate refused to clean their cell, staff worked with mental health staff to remove the inmate and have the cell cleaned and sanitized. *Id.*

## D. Strip Searches

To receive legal mail, SCU inmates had to be removed from their cell and taken to a recreation area where they could see the mail being opened and photocopied. Dkt. 79-14 ¶ 11. During Hawkins-el's time in the SCU, armed assaults on staff within the mail room increased. *Id.* ¶ 5. In response, and after pat-down searches alone had been unsuccessful in finding weapons used during these assaults, Major Voigtschild ordered that all SCU inmates needed to be strip searched any time they left their cell. *Id.* ¶¶ 6, 10.

The strip searches were conducted in the inmate's closed cell in front of two officers while the inmate was alone. *Id.* ¶ 8; Dkt. 79-15 ¶ 8. The inmate would undress himself and give his clothing to the officers. Dkt. 79-14 ¶ 7. Officers then visually examined behind the inmate's ears, in his mouth and under his tongue, under his scrotum, and over the inmate's whole person while the inmate turned and bent over at the waist. *Id.* Officers did not touch inmates during the strip searches. *Id.* ¶ 9. On one occasion, Hawkins-el refused to be strip searched by Officer Neff and therefore was unable to retrieve his legal mail. Dkt. 24-1 at 16.

## E. Food in the SCU[6]

Meals were delivered to the SCU in covered carts, which would be immediately distributed to inmates after being inspected by officers for missing or added items. Dkt. 79-11 ¶¶ 15–17. Although there was a general IDOC tray

---

[6] Hawkins-el testified during his deposition that he was not pursuing any claims against the IDOC defendants related to his weight loss. Dkt. 87 at 61.

replacement policy under which an inmate could request a replacement tray if they believed there was something wrong with the food, SCU inmates were not allowed to request replacement trays. Dkt. 79-1 at 93-94. Correctional officers, not Aramark employees, controlled enforcement of the tray replacement policy. Dkt. 76-1 ¶ 17.

As Aramark Correctional Service's Food Service Director at Wabash Valley, Bedwell was responsible for ensuring that inmate meals complied with Aramark's contract with the IDOC. *Id.* ¶¶ 6, 9. The meals had to offer inmates approximately 2500 to 2800 calories per day. *Id.* ¶ 7. Bedwell claims that although he was "aware of intermittent complaints about various food issues, [he had] no knowledge of a widespread issue regarding inadequate food portions or spoiled food items to inmates at Wabash Valley." *Id.* ¶ 18.

Hawkins-el and other SCU inmates frequently complained and filed grievances contending that the food they actually were receiving had inadequate portion sizes. Dkt. 79-1 at 92–93, 95, 97. Part of Hawkins-el's belief that he was not receiving appropriate portion sizes was based on his previous experience working in the Indiana State Prison kitchen. *Id.* at 98–99. Butler responded to at least two of Hawkins-el's grievances about the food. In one, Butler stated, "I got with floor staff and informed them that they need to make sure that serving portions are correct." Dkt. 87 at 12. In another, Butler stated in part, "[t]he Kosher supervisor will inspect all kosher hot and cold trays for the right portions and the quality of product being served." *Id.* at 15. Hawkins-el was confused by this second response, because he does not receive a Kosher diet. *Id.*

Hawkins-el, who is six feet tall, weighed approximately 210 pounds when he entered the SCU in September 2022.  Dkt. 79-1 at 91–92.  When he was released from the SCU and transferred to New Castle in November 2024, he weighed approximately 180–185 pounds.  *Id.* at 60.  By May 2025, when Hawkins-el was deposed, he weighed approximately 220 pounds.  *Id.* at 103.  On October 27, 2023, Hawkins-el had a medical appointment, at which his weight was listed as 186 and his BMI as 25.23.  Dkt. 87 at 7.  The record of this appointment omits any concerns about Hawkins-el's weight or recent weight loss. Nor did any medical provider express concern about Hawkins-el's diet during the relevant time.  Dkt. 79-1 at 92.  Hawkins-el twice requested medical visits in the spring of 2024 regarding his weight loss, but there is no record of him being evaluated by any provider in response to those requests.  Dkt. 87 at 4-5.  Hawkins-el testified in his deposition that he was not claiming that his weight loss caused him any physical or medical symptoms besides the weight loss itself.  Dkt. 79-1 at 103.

### F. Procedural History

The Court's screening order allowed the following claims to proceed:

> Fourteenth Amendment due-process claims against Defendants Porter-Marts, Fischer, Ellis, Purcell, Lehor, Gilmore, Vanihel, Meeks, and Moseley.  These claims are based on Mr. Hawkins-El's allegations that he has been confined to prolonged administrative segregation without due process.
>
> Eighth Amendment conditions of confinement claims against Defendants Yarber, Holcomb, Payne, Bedwell, and Butler.

21

First Amendment claims against Defendants Neff and Voigtschild based on allegations that they conditioned Mr. Hawkins-El's receipt of his legal mail on his submission to a purposeless body cavity search. To the extent Mr. Hawkins-El believes he has been subjected to additional strip searches for the sole purposes of harassment and humiliation, they may support an Eighth Amendment claim. However, "individual liability under § 1983 . . . requires personal involvement in the alleged constitutional deprivation." The only allegations against Defendants Neff and Voigtschild concern their conditioning access to legal mail on a purposeless search—not the execution of a search that would violate the Eighth Amendment.

Dkt. 30 at 5–6 (cleaned up). The Court dismissed claims against other defendants related to allegedly leaving Hawkins-el in the shower for long periods of time. *Id.* at 6. It also dismissed any claims "based on alleged deprivation of access to the Court . . . ." *Id.* at 7. Hawkins-el did not move to reconsider this order, nor did he file another amended complaint.

### III.  DISCUSSION

#### A. Due Process Claims

The Fourteenth Amendment to the Constitution does not create a due process liberty interest in avoiding transfer within a correctional facility or remaining in the general prison population. *See Wilkinson v. Austin*, 545 U.S. 209, 222 (2005); *Sandin v. Conner*, 515 U.S. 472, 484 (1995). Inmates have no liberty interest in avoiding short-term transfer to segregation for administrative, protective, or investigative purposes, even when they are subjected to harsher conditions as a result. *See, e.g., Townsend v. Fuchs*, 522 F.3d 765, 766 (7th Cir. 2008); *Lekas v. Briley*, 405 F.3d 602, 608-09 (7th Cir. 2005). However, due

22

process protections apply if the more restrictive conditions pose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 484. Placement in long-term segregation approaching a year or more may implicate this liberty interest, requiring further inquiry into whether the conditions of confinement impose an atypical, significant hardship. *See Marion v. Columbia Corr. Inst.*, 559 F.3d 693, 698–99 (7th Cir. 2009) (determination of whether 240 days in segregation imposed an atypical, significant hardship could not be made at the pleading stage); *see also Atwater v. Nickels*, No. 21-2510, 2022 WL 1468698, at *1 (7th Cir. May 10, 2022) (citing *Marion*, 559 F.3d at 694–98) (same).

If placement in "administrative" segregation meets the "atypical and significant hardship" standard, "the Due Process Clause mandates that prison officials periodically review whether an inmate placed in administrative segregation continues to pose a threat." *Isby v. Brown*, 856 F.3d 508, 524 (7th Cir. 2017) (citing *Hewitt v. Helms*, 459 U.S. 460, 477 n.9 (1983)). These periodic reviews need not be formal and adversarial. But they must be sufficient to ensure that administrative segregation does not become a pretext for indefinite confinement. *Id.* The sufficiency of periodic reviews is evaluated by considering "(1) the private interest (that is, [the inmate's] interest) affected by a governmental decision, (2) the governmental interests at stake, and (3) 'the risk of an erroneous deprivation of [the private] interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards.'" *Id.* (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).

Hawkins-el's claims regarding his time in the SCU runs only from when his disciplinary segregation time ended, in October 2023, until he was transferred to NCN TU in November 2024. So, his due process argument stems from a total placement in administrative segregation of approximately fourteen months.

The IDOC Defendants do not appear to dispute that not all IDOC policies and procedures regarding administrative segregation were strictly followed in his case. For instance, the IDOC Defendants do not dispute Hawkins-el's contention that upon being placed in administrative segregation, an inmate is entitled to reviews of the placement every seven days for the first two months of the placement and every 30 days thereafter. *See Dawson v. Dugan*, No. 2:19-CV-00222-MG-JPH, 2023 WL 5509255, at *3 (S.D. Ind. Aug. 23, 2023); *see also* Ind. Code § 11-10-1-7 (stating generally that the IDOC "shall review . . . . at least once every thirty (30) days" whether an inmate placed in segregation "for the offender's own physical safety or the safety of others" should remain in segregation). Aside from the initial decision to keep him in administrative segregation in October, there apparently were no reviews at all of his placement until January. Although Hawkins-el attempted to file several classification appeals during that time, they all were returned or rejected without consideration of the merits of the appeals. Rather, they were denied because they were filed too early, i.e., before there had been a final facility-level decision regarding a DWRH-A recommendation.

But this is all immaterial. A due process violation requires more than a technical failure to strictly comply with state law or with IDOC policies and procedures, which is all that the evidence construed in favor of Hawkins-el shows. *Smith v. Shettle*, 946 F.2d 1250, 1254 (7th Cir. 1991) ("Procedural regulations are not a source of constitutional entitlements, and violations of a state law that does not create such an entitlement are not actionable under the due process clause." (cleaned up)). Moreover, even assuming without deciding that Hawkins-el did face atypical and significant hardship compared to ordinary prison life, he received adequate review that no reasonable jury could conclude fellow below the minimum standard for due process.

First, with respect to the initial decision to extend his time in the SCU after his disciplinary segregation time was up, he was in administrative segregation "for the purpose of institutional safety and security" until officials could decide where he should go. *See Hall-Bey v. Hanks*, 93 F. App'x 977, 981 (7th Cir. 2004). In that sense, his confinement at this time was merely a paper transfer to a form of discretionary segregation that the Seventh Circuit says he "had no liberty interest in avoiding." *Townsend*, 522 F.3d at 771–72.

Second, Hawkins-el had ten 30-day status reviews of his SCU placement during the fourteen-month period at issue. Although many of the reviews contained similar language about Hawkins-el's refusal to participate in recommended programming, each review clearly was individually written by Caseworker Moseley and were not merely text auto-generated by a computer. Hawkins-el challenges the amount of input he actually had in Caseworker

25

Moseley's preparation of the reviews.  However, due process does not require periodic reviews to be formal or adversarial, and inmates are not ordinarily entitled to present evidence or statements.  *Hewitt*, 459 U.S. at 472, 477 n.9.

Third, Hawkins-el had three 90-day full status reviews of his placement. These reviews took into consideration Hawkins-el's written statements, and he was allowed the opportunity to explain his position at oral hearings before the review board.  Hawkins-el contends that not all members of the board considered evidence that he thought was relevant.  But, due process guarantees only the opportunity to present evidence, not every kind of evidence a prisoner may prefer. Following these 90-day reviews, board members issued written explanations for either recommending or not recommending that Hawkins-el be removed from DWRH-A.  No reasonable jury could conclude that these reviews were "shams," as Hawkins-el contends, because the third review in fact resulted in a recommendation that he be removed from DWRH-A and started the process of moving him out of that status.

Finally, in addition to the above reviews, Hawkins-el appealed the facility recommendation that he temporarily remain in DWRH-A.  Non-party Hendrix in the IDOC Central Office responded with a full written explanation of why his appeal was being denied.  Caseworker Moseley also completed an annual classification review of Hawkins-el's security level in April 2024.

In sum, given the relatively brief time Hawkins-el was in administrative segregation, the number of reviews he received, and the individualized consideration of Hawkins-el's placement as reflected in the written comments

26

following the reviews, the Court finds that no reasonable jury could conclude that he was denied due process or meaningful review of his placement during his fourteen months of administrative segregation time.  Hawkins-el's argument to the contrary boils down to arguing that the substantive results of many of his reviews were wrong, which is irrelevant to whether he received adequate due process.  *See Mockbee v. Dugan*, No. 2:20-cv-00536-JPH-MG, 2023 WL 6382599 at *5–7 (S.D. Ind. 2023) (concluding inmate received adequate due process in connection with one-year stay in segregation where he received six meaningful reviews of his placement, despite one four-month gap in any review of his status).

### B. Conditions of Confinement Claims

Under the Eighth Amendment, "prisoners cannot be confined in inhumane conditions." *Thomas v. Blackard*, 2 F.4th 716, 720 (7th Cir. 2021) (citing *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)).  A conditions-of-confinement claim includes both an objective and subjective component.  *Giles v. Godinez*, 914 F.3d 1040, 1051 (7th Cir. 2019).  Under the objective component, a prisoner must show that the conditions were objectively serious and created "an excessive risk to his health and safety."  *Id.* (cleaned up).  "[T]he Constitution does not require that prisons be comfortable."  *Delaney v. DeTella*, 256 F.3d 679, 683 (7th Cir. 2001).  Furthermore, "[i]nmates cannot expect the amenities, conveniences and services of a good hotel."  *Harris v. Fleming*, 839 F.2d 1232, 1235 (7th Cir.1988).

Under the subjective component, a prisoner must establish that the defendants had a culpable state of mind—that they "were subjectively aware of these conditions and refused to take steps to correct them, showing deliberate

indifference." *Thomas*, 2 F.4th at 720. Proving the subjective component is a "high hurdle" that "requires something approaching a total unconcern for the prisoner's welfare in the face of serious risks." *Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 458 (7th Cir. 2020) (internal quotations omitted). Neither "negligence [n]or even gross negligence is enough[.]" *Lee v. Young*, 533 F.3d 505, 509 (7th Cir. 2008).

Hawkins-el asserted in his second amended complaint that he experienced unconstitutional conditions of confinement in the SCU, with respect to temperature fluctuations, having limited opportunities to leave his cell, the cleanliness of the recreation areas, a lack of hot water, and the lights being either on or off 24 hours a day. *See* dkt. 30 at 4. But Hawkins-el has failed to refute the IDOC Defendants' designation of evidence regarding the conditions of confinement in the SCU. *See Beardsall v. CVS Pharmacy*, 953 F.3d 969, 972 (7th Cir. 2020) (discussing nature of non-movant's burden in response to properly supported motion for summary judgment). That undisputed designated evidence shows, at best, that Hawkins-el experienced occasional discomfort, not an "an excessive risk to his health and safety" caused by the alleged deliberate indifference by Defendants Lt. Yarber, Lt. Holcomb, and Payne. *Giles*, 914 F.3d at 1051. Rather, the undisputed evidence shows that temperatures in the SCU were constantly monitored, inmates received sufficient clothing for cold weather, and with more if requested, and remedial measures were taken if the temperature dropped too low. Inmates were offered daily recreation opportunities, and the recreation areas were frequently cleaned. Inmates

generally had the ability to directly control the lighting within their cells; if they did not, the issue would be fixed as soon as possible, given the antiquated equipment, and inmates could request the control booth to control the lighting until it was fixed.  To the extent there were occasional hot water problems in the SCU, they were fixed; in the meantime, alternate arrangements were made for the inmates to take hot showers while still having access to cold water in their cells.

As with the due process claims, Hawkins-el's main contention is that Lt. Yarber, Lt. Holcomb, and Payne did not always strictly comply with IDOC policies and procedures regarding maintenance and cleanliness.  Again, "[s]ection 1983 protects against constitutional violations, not violations of departmental regulation and practices."  *Estate of Simpson v. Gorbett*, 863 F.3d 740, 746 (7th Cir. 2017) (cleaned up).  The unrefuted designated evidence demonstrates as a matter of law that no Defendant acted with deliberate indifference to any potential risks to Hawkins-el health and safety while he was in the SCU.  They are entitled to summary judgment on the conditions of confinement claims.

### C. Strip Search Claims

Prisoners have a First Amendment interest in their incoming and outgoing mail correspondence subject to restrictions that are "'reasonably related to legitimate penological interests.'"  *Van den Bosch v. Raemisch*, 658 F.3d 778, 785 (7th Cir. 2011)  (quoting *Turner v. Safley*, 482 U.S. 78, 89, (1987)).  "Such legitimate penological interests might include crime deterrence, prisoner rehabilitation, and protecting the safety of prison guards and inmates."  *Id.*

Additionally, when it comes to an inmate's "legal mail," prison officials generally should only open such mail in the presence of the inmate. *See Kaufman v. McCaughtry*, 419 F.3d 678, 685–86 (7th Cir. 2005).

Hawkins-el challenges the reasonableness of requiring a strip search before he would be allowed to retrieve his "legal mail." Fourth Amendment principles inform the reasonableness of strip searches of prison inmates. The Seventh Circuit thoroughly addressed this question in *Henry v. Hulett*, 969 F.3d 769 (7th Cir. 2020):

> in the context of strip searches of prisoners as in others, courts must afford prison administrators "wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." . . . Thus, "in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters." . . . [P]rison strip searches . . . do not violate the Fourth Amendment where the level of intrusion does not outweigh the purported justification for the search. . . . The Fourth Amendment can, and must, account for institutional concerns.

*Henry*, 969 F.3d at 783–84 (citations omitted).

Here, the undisputed evidence shows that Major Voigtschild ordered that any SCU inmate being removed from their cell for any reason—including but not limited to going to retrieve legal mail—had to be strip searched. This policy was instituted in an attempt to reduce the increased number of armed assaults against staff in the SCU that pat-down searches alone had failed to prevent. The searches were conducted in each inmate's cell, not in public, and in front of only

30

two officers.  The officers did not touch the inmate.  This type of strip search, and for the given reasons, is precisely the type of search that the Seventh Circuit in *Henry* discussed and indicated it would find constitutional.  Officer Neff searched Hawkins-el in accordance with this policy, not to unreasonably burden his First Amendment rights to receive legal mail.  Major Voigtschild and Officer Neff are entitled to summary judgment with respect to these claims.

### D. Food Claims

Prison officials "must ensure that inmates receive adequate food," *Farmer*, 511 U.S. at 832, because a prison's "condition[s] of confinement" include the "food [a prisoner] is fed," *Wilson v. Seiter*, 501 U.S. 294, 303 (1991).  "[D]enial of food . . . in cases in which it inflicts serious harm on the prisoner," violates the Eighth Amendment.  *Freeman v. Berge*, 441 F.3d 543, 544 (7th Cir. 2006).  Such unconstitutional denials of food can include "not just ran[c]id food, but also a 'nutritionally deficient' diet."  *Antonelli v. Sheahan*, 81 F.3d 1422, 1432 (7th Cir. 1996).  That means a diet consisting of "meals deficient enough to pose a substantial risk of serious harm, as determined by the objective test of *Farmer*." *Williams v. Shah*, 927 F.3d 476, 480 n.3 (7th Cir. 2019).  To assess whether a nutritionally deficient diet meets *Farmer's* objective test, a "court must assess the amount and duration of the deprivation, . . . as well as the medical condition of the inmate."  *Id.* (quoting *Reed v. McBride*, 178 F.3d 849, 853 (7th Cir. 1999)).

Hawkins-el contends that Defendants Bedwell and Butler violated his Eight Amendment rights by depriving him of adequate food while he was in the SCU.  The Court assumes, without deciding, that there is a question of fact as

31

to whether the meals that Hawkins-el and other SCU inmates were receiving during the relevant time were "adequate" in the sense that they contained the quality, amount, and type of foods and number of calories that the inmates were supposed to receive under Aramark's food service contract with the IDOC.  *See also Walker v. Aramark Food Services, Inc.*, No. 1:23-cv-00573-JMS-TAB, 2025 WL 754492 (S.D. Ind. Mar. 10, 2025) (finding issues of fact regarding deficient portion sizes Wabash Valley SCU during a period of time between September 2022 and November 2024).  The Court also must credit Hawkins-el's assertion that he lost approximately 25 to 40 pounds while in the SCU (from 210 or 220 to 180 to 185 pounds).

But Hawkins-el must show more than weight loss to survive summary judgment.  "[H]e must also show that he suffered some cognizable harm' from the condition and that a defendant's 'deliberate indifference caused that harm.'" *Walker*, 2025 WL 754492 at * 17 (quoting *Gray v. Hardy*, 826 F.3d 1000, 1006 (7th Cir. 2016)).  Weight loss alone because of poor or inadequate food does not automatically result in a constitutional injury, especially when the inmate never reaches an objectively unhealthy weight.  *See, e.g., Freeman*, 441 F.3d at 544, 547 (observing that "there [was] no indication that [the inmate's] life or health were jeopardized" since "he ended up closer to the normal weight for a person of his height than when he began," though that is not a "complete defense"); *Owens v. Hinsley*, 635 F.3d 950, 953, 955 (7th Cir. 2011) (no cognizable constitutional claims against prison officials related to their alleged inadequate intervention in inmate's hunger strikes, based on weight loss of 20–30 pounds, and inmate was

32

overweight before hunger strikes, and there was "no evidence of medical complications" other than complaints of "bec[oming] weak" from lack of food). Generally, weight loss must cause more than "temporary discomfort"; rather, it must have caused "real suffering, extreme discomfort, or . . . lasting detrimental health consequences . . . ." *Freeman*, 441 F.3d at 547.

Here, Hawkins-el has not demonstrated extreme discomfort or severe health consequences as a result of his prison diet. To the contrary, one of his medical records dated October 27, 2023, shows that he weighed 186 pounds after he had been in the SCU for over a year. The medical provider expressed no concern about Hawkins-el's health as related to his weight and noted that his BMI was 25.23, which would put him in the very slightly "overweight" category. *See* https://www.cdc.gov/bmi/adult-calculator/bmi-categories.html (listing "healthy weight" BMI for an adult as between 18.5 to 25) (updated March 19, 2024). Hawkins-el did not lose much additional weight after this visit as there is no evidence in the record that he weighted any less than 180 pounds when he left the SCU. He did express in a couple of healthcare request forms that he was feeling weak from the inadequate food, but that alone has been held to be inadequate to state a constitutional injury from lack of food. *See Owens*, 635 F.3d at 955. Most importantly, he testified in his deposition that he was not claiming that his weight loss caused him any physical or medical symptoms besides the weight loss itself. Dkt. 79-1 at 103.

In sum, no reasonable jury could find that Hawkins-el's prison diet while in the SCU caused a cognizable Eighth Amendment injury.  Accordingly, Defendants Bedwell and Butler are entitled to judgment as a matter of law.

### IV. CONCLUSION

The Defendants' motion to substitute exhibit is **GRANTED**.  Dkt. [82]. Hawkins-el's motion to stay ruling on the summary judgment motions is **DENIED**.  Dkt. [84].  Hawkins-el's motions for case status update are **GRANTED** to the extent this Order provides said update.  Dkts. [101], [103].

Both motions for summary judgment are **GRANTED**.  Dkts. [74], [78]. Final judgment consistent with this Order and the Court's screening orders, dkts. [17] and [30], shall issue by separate entry.

**SO ORDERED.**

Date:  8/6/2026

Justin R. Olson
United States District Judge
Southern District of Indiana

Distribution:

All ECF-registered counsel of record via email

JOHN A. HAWKINS-EL
956724
NEW CASTLE - CF
NEW CASTLE CORRECTIONAL FACILITY - Inmate Mail/Parcels
1000 Van Nuys Road
P.O. Box E
NEW CASTLE, IN 47362